**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

McKEON PRODUCTS, INC.,
a Michigan corporation,

         Plaintiff,

v.

FLENTS PRODUCTS CO., INC., f/k/a
KARLEN MANUFACTURING CO.,
INC., a Delaware corporation,

         Defendant.

——————————————— /

# 02-73400

Case No. ' BERNARD A. FRIEDMAN

MAGISTRATE JUDGE CARLSON



Ann Marie Uetz (P48922) ✓
Foley & Lardner
150 W. Jefferson, Suite 1000
Detroit, Michigan 48226
Attorney for Plaintiff
(313) 963-6200

Kevin Tottis
Law Offices of Kevin Tottis ✓
One East Wacker Drive, Suite 2420
Chicago, Illinois 60601
Attorney for Plaintiff
(312) 923-9620

**VERIFIED COMPLAINT FOR PRELIMINARY INJUNCTION,**
**PERMANENT INJUNCTION AND DAMAGES**
**AND DEMAND FOR JURY**

Plaintiff, McKEON PRODUCTS, INC., ("McKeon") for its Complaint against

Defendant, FLENTS PRODUCTS CO., INC., f/k/a KARLEN MANUFACTURING, INC.,

("Flents") states as follows:

-1-

### Nature of the Action

1.      For nearly forty years, McKeon has been one of the country's leading manufacturers and distributors of earplugs in the drug, grocery and mass merchandising markets. This action arises out of Defendant Flents' wrongful and deliberate copying of McKeon's distinctive trade dress for use on the packages of Flents' private label earplugs. (Photographs of McKeon's trade dress and examples of Flents' infringing packaging are attached as Exhibits A and B respectively.) Flents' willful actions not only violate the Lanham Act, the common law, and Michigan Consumer protection laws, they also violate an earlier order of this Court, which prevents Flents' predecessor, Karlen Manufacturing, Inc. ("Karlen"), or any of its successors from using "any other confusingly similar mark or other form of unfair competition in connection with the sale or distribution of any of Karlen's products."

### The Parties, Jurisdiction and Venue

2.      McKeon is a corporation incorporated under the laws of the State of Michigan, having its principal place of business at 25460 Guenther, Warren, Michigan 48091.  Since the early 1960's, McKeon has manufactured and sold earplugs known as Mack's® and Mack's® Pillow Soft® earplugs.  McKeon is one of the nation's leading producers of earplugs for the retail consumer market.

3.      Flents is a Delaware corporation with its principal place of business at 5401 South Graham Road, St. Charles, Michigan 48655.  On information and belief, Flents is a manufacturer and distributor of earplugs sold under both its "Flents" name and various private-labels.  On information and belief, Flents is the successor in interest to Karlen.

4.      This Court has original jurisdiction pursuant to 15 U.S.C. §1121 and 28 U.S.C. §1331, 1338, as well as supplemental jurisdiction over the state law claims pursuant to 28 U.S.C.

§1367.  In addition, this Court has jurisdiction over the breach of contract count because of the Agreed Order to Retain Jurisdiction to enforce the terms of the Settlement Agreement between McKeon and Karlen in which this Court agreed to retain jurisdiction to enforce the terms of the agreement.  (A copy of the Settlement Agreement and Order is attached as Exhibit C.)

     5.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and (c) because Defendant resides in this district, a substantial part of the events giving rise to the claim occurred in this district, and Defendant is subject to personal jurisdiction in this district.

<strong>Background</strong>

**A.**    **McKeon's Development of the Mack's® Earplug Market.**

     6.     Since the early 1960's, McKeon has manufactured and sold a soft silicone-based earplug under the trademark "Mack's."  In or around 1968, after trying different formulas, McKeon developed a soft, pure silicone earplug and added the words "pillow soft" to its name. Since that time, McKeon has used the name "Mack's" and "Mack's Pillow Soft" interchangeably to refer to its earplugs.  In 1979, McKeon received a federal registration in the mark "Mack's Pillow Soft," and in 1988, it received a federal registration in "Mack's."  For at least the past 20 years, Mack's® Pillow Soft® earplugs have been the top-selling earplug for consumers in the country.

     7.     Over the years, McKeon has built a nationwide distribution network for Mack's® earplugs selling to drug, grocery and mass merchandisers' stores as well as the medical community.  By the late 1970's, Mack's® earplugs were sold in virtually every state and today they are sold in every state in the country as well as in several foreign countries.

     8.     The success of Mack's® earplugs has not gone unnoticed.  National newspapers repeatedly have written stories documenting McKeon's growth and the unique qualities of

Mack's[*] earplugs in ear and hearing protection. As early as 1981, the Washington Post ran a full-length feature on McKeon and the phenomenal growth and sales and product recognition of Mack's[*] earplugs. Since that time, several national publications including The New York Times, the Chicago Tribune, the Detroit Free Press, and the Detroit News have featured stories about Mack's[*] earplugs. In many cases, the articles have been syndicated over the various newspaper wire services. (See collection of articles, attached as Exhibit D .)

9.     In addition, Mack's[*] earplugs have enjoyed a popular reputation in the medical community. In the late 1970's, a medical journal recommended the earplugs as an effective means of protecting the ears from water when swimming or bathing. For precisely this purpose, McKeon has attracted a consistent and loyal following among physicians nationwide who recommend Mack's[*] earplugs to their patients.

10.     Mack's[*] earplugs' popularity, however, extends far beyond the medical community and includes a loyal and devoted customer base. Over the years, McKeon  has received hundreds of letters and e-mails from grateful customers reflecting the enormous goodwill McKeon has created for its product among the public. (See examples, attached as Exhibit E.)

11.     To build on and maintain the public's awareness and goodwill, McKeon each year spends a large percentage of its annual revenue on advertising. Thus far in 2002, for instance, McKeon has advertised in *Good Housekeeping*, *Parents Magazine*, *Triathlete[*] Magazine*, and several medical journals. (See copies of advertisements, attached as Exhibit F.) In recent years, McKeon has spent hundreds of thousands of dollars on advertising.

12.     McKeon's reputation for quality is unsurpassed by any of its competitors. In addition to its consistent and loyal customer base, for the past three years, McKeon has earned

- 4 -

the Good Housekeeping Seal.  According to Good Housekeeping, "study after study indicates that the great majority of consumers feel a product that bears the Seal is a good or superior product, *and that they would be more likely to buy the product*."  (Emphasis added.)  (Exhibit G)

13.     In addition, McKeon qualifies as an "ISO 9002" facility, an international quality assurance system.

14.     For most of its history, McKeon sold only silicone earplugs.  In the mid-1990's, however, recognizing the demand for other types of earplugs, McKeon decided to begin marketing a foam earplug and in 1996, introduced Mack's® SafeSound® foam earplug.  As a reflection of the enormous goodwill associated with the trademark "Mack's®" and, in turn, McKeon, since entering the market, SafeSound® foam earplugs have grown to one of the top-selling earplugs in the country, surpassing numerous other competitors who had long been in the market.

**B.     History of McKeon's Packaging.**

15.     During the early years of the development of Mack's® earplugs, McKeon sold the earplugs in translucent plastic boxes with a yellow and blue "hang tag" protruding from the box so that the boxes of earplugs could hang from a display in a store.

16.     One of the most effective means for marketing Mack's® earplugs, however, was selling them at a pharmacist's counter.  For these purposes, McKeon designed a "pop-up" display carton which, *inter alia*, consisted of an open box with a header extending out of the back of the box.  Ten years ago, McKeon adopted  its current trade dress for the box:  the background of the extension was royal blue with the trademark "Mack's" in white and the word "earplugs" in bright yellow.  (A photograph of the "pop-up" display is attached as Exhibit H.)

17.     In or about 1996, McKeon decided to update its packaging to make its products

more visible on both grocery and pharmacy shelves and to allow McKeon's distinctive trade dress to stand out even more.

18.    Accordingly, McKeon incorporated the design from its "pop-up" display box into the new cardboard packaging for earplugs.

19.    At that time, McKeon also introduced a "Value Pack." The value pack consists of a rectangular, horizontally positioned box with an extended header. The background color of the entire box is royal blue with the words "Mack's®" in white and the word "earplugs" in bright yellow across the header. The box portion of the packaging contains an opening, which exposes the silicone earplugs to the prospective customers. In addition, the box portion of the packaging lists the attributes of the earplugs in white, including the words 'Swim," "Sleep," "Shower," and "Sports." (See Exhibit A)

20.    Since introducing the new packaging in 1996, McKeon's sales of silicone earplugs have increased over 60 percent; its overall sales have increase nearly 110 percent.

C.    Karlen's History of Unfair Competition.

21.    In or about 1986, a former McKeon employee who had worked for McKeon in high school and had access to McKeon's product, raw materials, processing equipment and packaging on a regular basis, began working for a packaging company called Karlen, which shortly thereafter, began making silicone earplugs. Karlen's earplugs were strikingly similar to McKeon's. Although smaller, they were also made of silicone. Like McKeon's earplugs at the time, Karlen's earplugs were sold four to a package in a clear plastic snap-lock box with blue lettering and sold under Karlen's name "ProTech" as well as under several house labels, including Eckerd and Arbor Drug Stores.

- 6 -

22.     After 1986, Karlen repeatedly took portions of McKeon's packaging and promotional materials and added the materials to its own packaging. For instance, in the years just preceding the introduction of Karlen's silicone earplugs, McKeon's display box for the earplugs called the Mack's° earplugs the "Ear Doctors' Silicone earplugs." When Karlen introduced its earplugs, its packaging immediately proclaimed its earplugs as the "Ear Doctors' Choice," even though Karlen's earplugs were brand new to the market and no "ear doctor" had the opportunity to choose or not choose Karlen's earplugs.

23.     At some point in the late 1980's, McKeon added a "hotline" number for any consumer who misused the product and was unable to remove Mack's° earplugs from his or her ears. Shortly after McKeon recorded these instructions and warning, Karlen issued virtually identical instructions on its package.

24.     Karlen's attempts at copying aspects of McKeon's product and packaging were all made with the specific intent to create confusion in the marketplace as to the source and sponsorship of its earplugs and to compete unfairly with McKeon.

25.     Karlen's attempts at creating confusion in the marketplace became even more apparent in or about late 1995 when Karlen began distributing earplugs under the trade name "max," the phonetic equivalent of Mack's°.

26.     Karlen distributed the earplugs through the drugstore chain Eckerd. The earplugs, in turn, were sold and marketed under Eckerd's house label along with the name "Max."

27.     In 1995, McKeon sued Karlen alleging trademark infringement and other forms of unfair competition arising out of Karlen's use of the trademark "Max" and its history of unfair competition. (A copy of the complaint, without exhibits, is attached as Exhibit I.)

28.     In September 1996, McKeon agreed to settle its claims against Karlen for a

payment of $25,000, and Karlen's promise:

> ...that it will immediately cease using the word or mark "Max,"
> "Mack's," *or any other confusingly similar mark or other form of*
> *unfair competition in connection with the sale or distribution of*
> *any of Karlen's products.*  Karlen further acknowledges that the
> United States District Court for the Eastern District of Michigan
> will retain jurisdiction to enforce this paragraph and other
> provisions of this Agreement and that a violation of this paragraph
> will constitute a violation of the Court's order.

(See Exhibit C.)

29.     On November 8, 1996, this Court entered an order dismissing the action against

Karlen and specifically agreed to:

> ...retain jurisdiction to enforce the terms of the Settlement
> Agreement entered into by McKeon and Karlen, a copy of which is
> attached to the parties' Stipulation of Dismissal of Karlen
> Manufacturing, Inc. as Exhibit A.

(See Exhibit C.)

30.     The Agreement further provided:

> ...each, every and all of the terms shall survive the execution of this
> Agreement and shall be binding upon and inured to the benefit of
> the parties and their respective heirs, executors, administrators,
> successors, and assigns, as the case may be.

31.     Even after signing the Agreement, in direct violation of the Settlement

Agreement, Karlen distributed earplugs to a Canadian company called Pharmasystems, which

sold them under the "MAX" name.  (On information and belief, Karlen also packaged the

earplugs.)  An example of the earplug packaging is attached as Exhibit J.

32.     Based on the representation of Timothy Drumhiller (Flent's current president) that Karlen no longer sold to Pharmasystems, McKeon agreed to forego any further action.  (See letter, Exhibit K)

**D.     Flents Merges with Karlen.**

33.     For many years, Flents was headquartered in New York and was a competitor of McKeon's.

34.     On information and belief, in 1999 Flents acquired substantially all of Karlen's assets and moved its headquarters to Karlen's headquarters at 5401 South Graham Road, St. Charles, Michigan 48655.

35.     According to the Asset Purchase Agreement Flents' holding company, PTI  Inc. filed with the Securities and Exchange Commission, Flents purchased from Karlen:

> ...all contracts, promissory notes, leases of personal property and agreements listed on Schedule 1.1(ii) hereto, and all other contracts, leases, agreements, promissory notes and other evidences of indebtedness to Karlen in connection with the Business;

See Asset Purchase Agreement, ¶ 1.1 (ii),  attached as Exhibit L.

**E.     Flents Copies McKeon's Trade Dress**

36.     Over the years, McKeon has developed its distinctive trade dress in its packaging including:

> A royal blue background with the word "earplugs" in large print and in bright yellow, and white lettering describing the uses of the earplugs including the words "Swim," "Sleep," "Shower," and "Sports."

37.     In addition, this distinctive color scheme is frequently featured on a rectangular box configured horizontally, with a flat hang tag containing the words "Mack's® Pillow Soft®" and "earplugs" and with a clear window in the box portion allowing a plain view of the silicone

earplugs contained in it.

38. A combination of these features gives McKeon's products a distinctive overall look and appearance. (See Exhibit A.) This unique and distinctive trade dress has been referred to as McKeon's trade dress.

39. When consumers call McKeon inquiring about purchasing McKeon's earplugs, McKeon's staff instructs the customers that the earplugs are contained in large royal blue boxes with the word "earplugs" across the top of the box in bright yellow with a window.

40. Over time, consumers of Mack's• earplugs have come to associate the distinctive McKeon trade dress of Mack's• earplug products as coming from a single source, namely McKeon.

41. McKeon's trade dress is non-functional, as competitors may use alternative designs and ornamental features to make other packaging.

42. McKeon is the only major earplug manufacturer which uses the word "earplugs" in large letters horizontally across the top of its product and the only major earplug manufacturer to use the distinctive blue, yellow and white color scheme. (See photographs of earplug drug store display, attached as Exhibit M.)

43. On information and belief, in or about June 2002, Flents began distributing private label earplugs to large drugstore chains in packaging modeled directly after McKeon's Value Pack. The Flents' packaging is the identical size and shape as McKeon's Value Pack, and is the identical royal blue.

44. Across the middle of the hang-tag in large bright yellow letters is the word "earplugs."

45. The package contains a window in which the silicone earplugs can be viewed.

The silicone earplugs are arranged with four horizontally by three vertically in a plastic box just as they are on McKeon's packaging.

46.     The words "Swim," "Sleep," "Shower," and "Sports" are set forth in white letters on the packaging.  All remaining lettering on the packaging is white.

47.     The overall impression of the Flents silicone earplug packaging is identical to that of McKeon's. (See Flent's silicone earplugs box, Exhibit B.)

48.     Flents also has begun selling a similar box of foam earplugs consisting of a royal blue horizontal box attached to a hang-tag with the word "earplugs" in bright yellow across the middle of the hang-tag.

49.     The box also states "Sleep," "Study," "Work," and "Sports" in white lettering.

50.     The overall impression of the Flents foam earplugs box is identical to McKeon's. (A photograph of the Flents' foam earplugs box is attached as Exhibit N.)

51.     On information and belief, in July 2002, Flents began selling a similar box of silicone earplugs to Albertson's™ for resale under Albertson's™ private label.

52.     The box is identical in size and shape to McKeon's Value Pack and consists of a royal blue background with bright yellow and white lettering.

53.     Across the top of the hang-tag, the box contains the words "earplugs" in large letters.  Although the word "earplugs" is not in bright yellow, it is in white and yellow.  In addition, across the top of the hang-tag is a large bright yellow stripe.  As a result, the overall impression of the packaging is the same as McKeon's distinctive trade dress. (See photo of packaging, attached as Exhibit O.)

54.     On information and belief, Flents has and will continue marketing similar variations on McKeon's trade dress in an attempt to confuse customers and further dilute

McKeon's strong trade dress.  (See examples of additional use of McKeon's trade dress, attached as Exhibit P)

55.    To further add to the confusion, the manufacturer of the private label earplug is not identified anywhere on the earplug packaging.  See backs of earplug packaging attached as Exhibit Q.

56.    On information and belief, Flents' actions were undertaken deliberately and willfully with the specific intention of deceiving the trade and purchasing public into believing that its earplugs are McKeon's earplugs or in some way connected with McKeon.

## COUNT I

### Violation of 15 U.S.C. §1125(a)

57.    For a decade, McKeon has expended considerable amounts of time and money promoting, advertising and distributing earplugs utilizing McKeon's distinctive royal blue, bright yellow and white trade dress.

58.    As a direct result of McKeon's years of promotion, McKeon's trade dress has become well known throughout the United States as identifying the source of high-quality earplugs.  Several national news sources have written about McKeon's earplugs, physicians recommend them by name nationwide, and consumers specifically seek out Mack's[*] earplugs and are instructed to look for royal blue, bright yellow and white packaging.  Over the years, McKeon's trade dress has been used in its packaging containers and numerous other types of advertising and promotional materials.

59.    Despite McKeon's firmly established and long-running common-law and statutory rights in its trade dress, Flents began using McKeon's trade dress throughout the United States.

60.    The use of McKeon's trade dress for Flents' products causes a likelihood of confusion, deception and mistake and constitutes a false designation of origin and description in direct violation of 15 U.S.C. §1125(a).

61.    Flents' use of McKeon's trade dress was done with a specific intention to confuse and deceive the public and to lead the public to erroneously conclude that Flents' products are produced by McKeon or that the products have been placed upon the market with McKeon's consent and authority.  As a direct result of Flents' intentional conduct McKeon has suffered irreparable harm in the marketplace.

62.    The continued and expanded use of the confusingly similar trade dress will continue to cause confusion and deception as to source and sponsorship in the marketplace, and will continue to cause serious and irreparable injury to McKeon.

63.    On information and belief, Flents' acts have been carried out in interstate commerce and have resulted in the loss of sales to McKeon.  Unless enjoined, such acts by Flents will result in substantially increase loss of sales by McKeon and will lead to permanent loss of the market share in the relevant product category.

64.    On information and belief, Flents plans to increase its sale and distribution of earplugs thus far sold under McKeon's trade dress.  Unless Flents is immediately enjoined, McKeon's sales could be even more substantially harmed than they have been to date.

65.    On information and belief, Flents' acts were aimed at the willful misappropriation of McKeon's trade dress and the valuable goodwill of McKeon's business, thus unlawfully benefiting Flents.

66.    Unless enjoined, continuance of Flents' acts will substantially injure McKeon's business and reputation and will dilute the distinctive quality of McKeon's trade dress.

- 13 -

WHEREFORE, McKeon requests that this Court grant the following relief:

(a)  that this Court find that McKeon is the owner of distinctive trade dress as outlined above and that Flents has infringed this trade dress;

(b)  that Flents' employees, servants, agents, and all others acting in concert with it be enjoined, both preliminarily during the pendency of the litigation as well as permanently thereafter, from infringing McKeon's trade dress and/or using any other trade dress which is a colorable imitation of McKeon's trade dress in such a manner that is likely to cause confusion or to cause a mistake or to deceive the purchasing public;

(c)  that Flents be directed to file with this Court and serve on McKeon within 30 days after service of the injunction, a report in writing, under oath, setting forth in detail the manner and form in which Flents has complied with the injunction;

(d)  that Flents be ordered to account for and pay McKeon all profits, gains, and advantages wrongfully realized by Flents through its acts of trade dress infringement;

(e)  that Flents be ordered to pay McKeon such damages as McKeon has sustained as a consequence of Flents' acts of trade dress infringement, including multiple damages in the amount of three times the damages sustained by McKeon pursuant to 15 U.S.C. §1117;

(f)  that pursuant to 15 U.S.C. §1118, this Court orders Flents to deliver and destroy any and all labels, signs, prints, packages, wrappers, receptacles and advertisements incorporating the infringing trade dress;

(g)    that pursuant to 15 U.S.C. §1117, Flents pay McKeon costs and attorneys' fees; and,

(h)    that this Court award any and additional relief which it deems appropriate.

## COUNT II

### Breach of Contract

67.    McKeon incorporates all of the preceding paragraphs.

68.    In September 1996, McKeon, Flents' predecessor, Karlen, entered into a settlement agreement (the "Settlement Agreement") in which it provided:

> Karlen agrees that it will immediately cease using the word or words "MAX," "MACK'S," or *any other confusingly similar mark or other form of unfair competition* in connection with the sale of distribution of any of Karlen's products.

(Emphasis added.)  (Exhibit  C, ¶10.)

69.    The Agreement further provided:

> Each, every and all of the terms shall survive the execution of this Agreement and shall be binding upon and inure to the benefit of the parties and their respective heirs, executors, administrators, successors, and assigns, as the case may be.

(Exhibit c, ¶10.)

70.    In addition, in its Order of Dismissal of November 8, 1996, this Court agreed to retain jurisdiction to enforce the terms of the Settlement.

71.    Pursuant to the terms of Settlement Agreement, Karlen specifically acknowledged:

> ...that the United States District Court for the Eastern District of Michigan will retain jurisdiction to enforce this paragraph and other provisions of this agreement and *that a violation of this paragraph will constitute a violation of the Court's order.*

(Emphasis added.)  (Exhibit c, ¶3.)

- 15 -

72. In the late 1990's, Karlen and Flents merged.

73. As part of the merger, Flents purchased all of Karlen's contracts which, by definition, would include the Settlement Agreement.

74. By copying McKeon's trade dress, Flents directly violated Paragraph 3, using a "confusingly similar mark or other form of unfair competition" thereby specifically violating the terms of the Agreement and violating the Court's order.

WHEREFORE, McKeon requests:

(a) that this Court issue a Rule to Show Cause as to Why Flents Should Not be Held in Contempt for violating this Court's order;

(b) that this Court award McKeon all damages it has suffered as a result of the violation of the Court order;

(c) that pursuant to this Court's inherent authority to enforce its orders, this Court award McKeon its costs and attorneys' fees incurred in enforcing the order; and

(d) that this Court award any other relief its deems reasonable and just.

## COUNT III

### Common-law Trade Dress Infringement

75. McKeon restates and incorporates all preceding paragraphs. McKeon holds common-law rights in the trade dress identified above.

76. Flents' acts set forth above constitute violation of McKeon's common-law rights in its trade dress.

- 16 -

WHEREFORE, McKeon requests that this Court grant the following relief:

(a)    that this Court find that McKeon is the owner of distinctive trade dress as outlined above and that Flents has infringed this trade dress;

(b)    that Flents' employees, servants, agents, and all others acting in concert with it be enjoined, both preliminarily during the pendency of the litigation as well as permanently thereafter, from infringing McKeon's trade dress and/or using any other trade dress or mark which is a colorable imitation of McKeon's trade dress in such a manner that is likely to cause confusion or to cause a mistake or to deceive the purchasing public;

(c)    that Flents be directed to file with this Court and serve on McKeon within 30 days after service of the injunction, a report in writing, under oath, setting forth in detail the manner and form in which Flents has complied with the injunction;

(d)    that Flents be ordered to account for and pay McKeon all profits, gains, and advantages wrongfully realized by Flents through its acts of trade dress infringement;

(e)    that Flents be ordered to pay McKeon such damages as McKeon has sustained as a consequence of Flents' acts of trade dress infringement.

(f)    that this Court award any and additional relief which it deems appropriate.

**COUNT IV**

**Violation of Michigan's Consumer Protection Act**

77.    McKeon restates and incorporates  all preceding paragraphs. Flents meets the definition of "persons" engaged in "trade or commerce" under MCL 445.902(c) and (d).

78.    As set forth above, Flents has intentionally caused a probability of confusion and

misunderstanding as to the source, sponsorship and approval of McKeon's earplugs.

79.     Flents' sale and distribution of earplugs, under the deceptively similar trade dress, constitutes deceptive representations of the goods.

80.     In addition, by distributing and selling earplugs in deceptively similar trade dress to McKeon's, Flents has misrepresented the sponsorship, approval, characteristic, benefits, status and affiliation of their products.

81.     Flents' acts constitute violations of MCL 445.903.

WHEREFORE, McKeon requests this Court the following relief:

(a)     that this Court find that McKeon is the owner of distinctive trade dress as outlined above and that Flents has violated MCL 445.903 by using McKeon's trade dress;

(b)     that pursuant to MCL 445.911 Flents' employees, servants, agents, and all others acting in concert with it be enjoined, both preliminarily during the pendency of the litigation as well as permanently thereafter, from infringing McKeon's trade dress and/or using any other trade dress or mark which is a colorable imitation of McKeon's trade dress in such a manner that is likely to cause confusion or to cause a mistake or to deceive the purchasing public;

(c)     that Flents be directed to file with this Court and serve on McKeon within 30 days after service of the injunction, a report in writing, under oath, setting forth in detail the manner and form in which Flents has complied with the injunction;

(d)     that Flents be ordered to account for and pay McKeon all profits, gains, and advantages wrongfully realized by Flents through its acts of trade dress infringement;

(e)     that Flents be ordered to pay McKeon such damages as McKeon has sustained as

a consequence of Flents' acts of trade dress infringement, MCL 445.911;

(f)    that pursuant to MCL 445.911, Flents pay McKeon costs and attorneys' fees; and,

(g)    that this Court award any and additional relief which it deems appropriate.

## COUNT V

### Dilution - Violation of 15 U.S.C. §1125(c)

82.    McKeon incorporates all preceding paragraphs.

83.    McKeon's distinctive trade dress constitutes a "famous" mark, pursuant to 15 U.S.C. §11.25(c).

84.    Flents' incorporation of McKeon's distinctive blue, yellow and white trade dress into all of its private label earplugs has and will dilute McKeon' distinctive dress in the consumer earplug market.

85.    On information and belief, Flents willfully intended to trade on McKeon's reputation and to cause dilution of McKeon's famous trade dress.

WHEREFORE, McKeon requests that this Court grant the following relief:

(a)    that this Court find that McKeon is the owner of famous trade dress;

(b)    that this Court find that Flents has willfully diluted McKeon's trade dress;

(c)    that Flents' employees, servants, agents, and all others acting in concert with it be enjoined, both preliminarily during the pendency of the litigation as well as permanently thereafter, from diluting McKeon's trade dress and/or using any other trade dress which is a colorable imitation of McKeon's trade dress in such a manner;

(d)    that Flents be directed to file with this Court and serve on McKeon within 30 days after service of the injunction, a report in writing, under oath, setting forth in

- 19 -

detail the manner and form in which Flents has complied with the injunction;

(e)    that Flents be ordered to account for and pay McKeon all profits, gains, and advantages wrongfully realized by Flents through its acts of trade dress infringement;

(f)    that Flents be ordered to pay McKeon such damages as McKeon has sustained as a consequence of Flents' acts of trade dress dilution, including multiple damages in the amount of three times the damages sustained by McKeon pursuant to 15 U.S.C. §1117;

(g)    that pursuant to 15 U.S.C. §1118, this Court order Flents to deliver and destroy any and all labels, signs, prints, packages, wrappers, receptacles and advertisements incorporating the trade dress;

(h)    that pursuant to 15 U.S.C. §1117, Flents pay McKeon costs and attorneys' fees; and,

(i)    that this Court award any and additional relief which it deems appropriate.

## JURY DEMAND

Plaintiff demands trial by jury as to all counts so triable.

Kevin Tottis
Law Offices of Kevin Tottis
One East Wacker Drive, Suite 2420
Chicago, Illinois 60601
Attorney for Plaintiff
(312) 923-9620

Ann Marie Uetz (P48922)
Foley & Lardner
150 W. Jefferson, Suite 1000
Detroit, Michigan 48226
Attorneys for Plaintiff
(313) 963-6200

Dated:  August 22, 2002

## VERIFICATION

I, Devin Benner, President of McKeon Products, Inc., declare and verify that the allegations above are true to the best of my information, knowledge and belief.

Devin Benner, President of McKeon Products, Inc.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

# SEE CASE FILE FOR ADDITIONAL DOCUMENTS OR PAGES THAT WERE NOT SCANNED