# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

McKEON PRODUCTS, INC.,
a Michigan corporation,

        Plaintiff,

v.

FLENTS PRODUCTS CO., INC., f/k/a
KARLEN MANUFACTURING CO.,
INC., a Delaware corporation,

        Defendant.

# 02-73400

Case No. **BERNARD A. FRIEDMAN**

## MAGISTRATE JUDGE CARLSON

FILED AUG 22 P 3 36
U.S. DIST. COURT CLERK
EASTERN DIST. MICHIGAN
DETROIT

Ann Marie Uetz (P48922)
Foley & Lardner
150 W. Jefferson, Suite 1000
Detroit, Michigan 48226
Attorney for Plaintiff
(313) 963-6200

Kevin Tottis
Law Offices of Kevin Tottis
One East Wacker Drive, Suite 2420
Chicago, Illinois 60601
Attorney for Plaintiff
(312) 923-9620

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, McKEON PRODUCTS, INC., ("McKeon"), through its attorneys, Kevin Tottis, pursuant to Fed.R.Civ. p. 65(a), respectfully moves this Court to preliminarily enjoin Defendant Flents Products Co. ("Flents") from using McKeon's distinctive royal blue, bright yellow and white trade dress in connection with the sale of any earplug products. In support, McKeon states as follows:

1.      For nearly a decade, McKeon has utilized distinctive royal blue packaging with the bright yellow word "earplugs" across the top of the packaging with white letters in connection with the sale of its top-selling Mack's trade mark sign earplugs.

2.      Flents' recently has introduced a line of private-label earplugs in which it has incorporated McKeon's distinctive trade dress. There is a high likelihood that McKeon will succeed on the merits of the following claims:

- That Flents violates 15 U.S.C. §1125(a) by infringing McKeon's trade dress;

- That Flents violates 15 U.S.C. §1125(c) by diluting McKeon's trade dress; and

- That Flents violates the terms of a 1996 Settlement Agreement by copying McKeon's trade dress.

3.      McKeon has and will continue to suffer irreparable harm if Flents is permitted to continue using McKeon's trade dress in the market place.

4.      Issuing a preliminary injunction will not cause harm to any third-parties.

5.      Enforcement of trademark laws serves the public interest and a preliminary injunction will further these goals.

6.      Counsel for McKeon and counsel for Flents have communicated regarding the relief requested herein via correspondence dated July 11, 2002 and August 21, 2002, respectively. See Exhibits 2 and 3 to Plaintiff's Brief in Support. In addition, prior to filing this

- 2 -

motion, on August 22, 2002, counsel for McKeon attempted to contact counsel for Flents regarding the relief requested herein.  Counsel for McKeon left a detailed voicemail for counsel for Flents requesting concurrence in the relief sought herein.  Concurrence has not been obtained.

In support of its request for a preliminary injunction, McKeon relies upon this motion, its brief in support and the Exhibits thereto, and its Verified Complaint and Exhibits thereto (which are incorporated by reference herein).

## CONCLUSION

WHEREFORE, McKeon respectfully requests that this Court:

      a)      Enjoin Flents, its employees, servants, agents and all others acting in concert with it during the pendency of this litigation from infringing McKeon's distinctive royal blue, bright yellow and white trade dress and from using any other trade dress which is a colorful imitation of the trade dress in such a manner that it is likely to cause confusion or to cause a mistake or to deceive the public.

      b)      Order Flents to file with this Court and serve on McKeon within 30 days after service of the preliminary injunction, a report in writing, under oath, setting forth in detail the manner and form in which Flents has complied with the injunction;

      c)      Award any additional relief it deems reasonable and appropriate.

Respectfully submitted,

_____

Kevin Tottis
Law Offices of Kevin Tottis
One East Wacker Drive, Suite 2420
Chicago, Illinois 60601
Attorney for Plaintiff
(312) 923-9620


Ann Marie Uetz (P48922)
Foley & Lardner
150 W. Jefferson, Suite 1000
Detroit, Michigan 48226
Attorney for Plaintiff
(313) 963-6200

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

McKEON PRODUCTS, INC.,
a Michigan corporation,

      Plaintiff,

v.

FLENTS PRODUCTS CO., INC., f/k/a
KARLEN MANUFACTURING CO.,
INC., a Delaware corporation,

      Defendant.

_____ /

**02-73400**

Case No. BERNARD A. FRIEDMAN

MAGISTRATE JUDGE CARLSON

FILED
AUG 22 P 3 36
U.S. DIST. COURT CLERK
EAST. DIST. MICHIGAN
DETROIT

Ann Marie Uetz (P48922)
Foley & Lardner
150 W. Jefferson, Suite 1000
Detroit, Michigan 48226
Attorney for Plaintiff
(313) 963-6200

Kevin Tottis
Law Offices of Kevin Tottis
One East Wacker Drive, Suite 2420
Chicago, Illinois 60601
Attorney for Plaintiff
(312) 923-9620

## PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION
### FOR PRELIMINARY INJUNCTION

## CONCISE STATEMENT OF ISSUES PRESENTED

I.    Is McKeon likely to succeed on its claim that there is a likelihood of confusion between McKeon's trade dress and Flents' packaging?

                Plaintiff's answer:    Yes

                Defendant's answer:    No

II.   Is McKeon likely to succeed on its claim that Flents' packaging dilutes McKeon's trade dress?

                Plaintiff's answer:    Yes

                Defendant's answer:    No

III.  Is McKeon likely to succeed on its claim that Flents breached the Settlement Agreement?

                Plaintiff's answer:    Yes

                Defendant's answer:    No

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

<u>Cases</u>                                                                                                    <u>Page</u>

*Esercizio v. Roberts*, 944 F.2d 1235, 1242 (6th Cir. 1991) ................................................................   4

*McNeil-PPC, Inc. v. Guardian Drug Company, Inc.*, 84 F.Supp.2d 066 (E.D. Mich. 1997)...............   4

*Blockbuster Entertainment Group v. Laylco, Inc.*, 869 F.Supp. 505, 510 (E.D. Mich. 1994) ...............   4

*V Secret Catalogue, Inc. v. Moseley*, 259 F.3d 464, 468-469 (6th Cir. 2001)..........................................   17

*Nabisco, Inc. v. PF Brands Co.*, 191 F.3d 208, 215 (2nd Cir. 1999) ........................................................   17


## <u>Statutes</u>

15 U.SC. § 1125(a) ......................................................................................................................................   9

15 U.S.C. §. 1125 (c) ..................................................................................................................................   18

15 U.S.C. §1125(c)(1)..................................................................................................................................   16

For at least the past two decades, McKeon's Mack's[*] earplugs have been the top selling earplug in the drug, grocery and mass merchandising market. As the market leader, McKeon frequently has been the victim of imitators, both lawful and unlawful. In 1996, defendant Flents Products Co.'s ("Flents") predecessor Karlen Manufacturing, Inc. ("Karlen") went so far as to try to sell private market earplugs under the phonetic twin "Max." After McKeon sued for trademark infringement, Karlen, on behalf of itself and its successors, settled with a payment of $25,000 and the promise never again to attempt to imitate McKeon's marks or engage in any other form of unfair competition. This Court retained jurisdiction to enforce terms of the agreement.

Now, some six years later, Karlen's successor Flents has engaged in precisely the same unfair competition it agreed never to repeat by directly copying McKeon's distinctive blue, yellow and white trade dress, on apparently all of its private-label earplug packaging. This district specifically recognizes that such private label imitations constitute unfair competition under the Lanham Act. *McNeil–PPC, Inc. v. Guardian Drug Company, Inc.*, 84 F.Supp.2d 1066 (E.D. Mich. 1997). Moreover, the Sixth Circuit has held that where, as here, it is clear that Flents intended to copy McKeon's trade dress (one of Flents' packages actually states "Compare to Mack's[*]") such intentional copying on its own "may be sufficient to justify the inference that there is confusing similarity." *Esercizio v. Roberts,* 944 F.2d 1235, 1242 (6th Cir. 1991). Moreover, Flents' decision to blanket the market with copies of McKeon's well-known trade dress also violates the recently-enacted Federal Trademark Dilution Act.

This overwhelming authority combined with Flents' flagrant violation of the Court's order makes the need for a preliminary injunction particularly compelling. The longer this Court allows Flents' infringing and diluting packaging to exist in the marketplace, the longer the consuming public and McKeon are damaged. This Court should not countenance such blatant disregard of its orders or unfair competition laws and should preliminarily enjoin Flents from selling any products using McKeon's trade dress.

### Facts

McKeon is a family-owned business located in Warren, Michigan which since the early 1960's has manufactured and sold a soft silicone-based earplug under the trademark "Mack's" and "Mack's Pillow Soft." (Verified Complaint, ¶2).[1]  Today, Mack's earplugs are sold in drug stores, grocery stores and mass merchandisers in every state in the country as well as several foreign countries.  (¶7).

The sale of Mack's earplugs has not gone unnoticed.  Newspapers repeatedly have featured stories about Mack's earplugs. (¶8, Exhibit D).  Mack's earplugs also have a loyal and devoted customer base.  Over the years, McKeon has received hundreds of unsolicited letters and e-mails from grateful customer reflecting the enormous goodwill McKeon has created for its product among the public.  (¶10, Exhibit E).  For the past three years McKeon has earned the *Good Housekeeping* seal of approval.  According to *Good Housekeeping*, "study after study indicates that the great majority of consumers feel a product that bears this Seal is a good or superior product, *and that they would be more likely to buy the product*." (¶12, Exhibit G) (emphasis added).  To further build on and maintain the public's awareness and good will, in recent year, McKeon has spent hundreds of thousands of dollars on advertising.  (¶H).  This year it has advertised in *Good Housekeeping, Parent's Magazine, Triathlete Magazine*, and several medical journals. (¶11, Exhibit F).

### McKeon changes its packaging.

Until the early 1990's McKeon sold its earplugs in translucent plastic boxes with a yellow and blue "hang tag" protruding from the box. (¶15).  One of the most effective means of selling and marketing Mack's earplugs, however, was at pharmacists' counters.  (¶16)  McKeon designed a "pop-up" display carton for this purpose, which, *inter alia*, consisted of an open box with a "header" extending out of the back of the box.  Ten years ago, McKeon began using its current trade dress on the box; i.e., the background of

---

1       All paragraph references are to McKeon's Verified Complaint.  Unless otherwise noted, exhibit references are to exhibits to the Verified Complaint.

the box was royal blue with the trademark "Mack's®" in white and the word "earplugs" in bright yellow across the top of the header.  (A photograph of the pop-up display is attached as Exhibit H to the Verified Complaint.)

In or about 1996, McKeon decided to update its packaging to make its product more visible on both grocery and pharmacy shelves and to allow McKeon's distinctive trade dress to further identify its products. (¶17).  Accordingly, McKeon incorporated the design from its "pop-up" display box into new cardboard packaging for earplugs.  (¶18).  Since introducing its new packaging in 1996 silicone earplug sales have increased over 60 percent; overall sales have increased almost 110 percent.  (¶19).

**Karlen's history of unfair competition.**

As set forth in the Verified Complaint at paragraphs 21 through 24, for years Karlen had a history of copying McKeon, but in 1995, Karlen went so far as to begin distributing earplugs under the name "Max," the phonetic equivalent of Mack's®.  McKeon sued Karlen alleging trademark infringement and other forms of unfair competition arising out of this history of unfair competition.  (¶27).  In September 1996, McKeon agreed to settle its claims against Karlen for a payment from Karlen of $25,000 and, even more importantly, Karlen's promise:

> ...that it will immediately cease using the word or mark "Max," "Mack's," or any other confusingly similar mark or other form of unfair competition in connection with the sale or distribution of Karlen's products.

(¶28).  The agreement provided that all of its terms would be binding upon any successors:

> ...each, every and all the terms shall survive the execution of this Agreement and shall be binding upon and inured to the benefit of the parties and their respective heirs, executors, administrators, successors, and assigns, as the case may be.

On November 8, 1996, this Court entered an order pursuant to stipulation dismissing the action by McKeon against Karlen, but agreed to retain jurisdiction to enforce the terms of the parties' settlement agreement.  (¶28, Exhibit C).

Within a few years, however, in direct violation of the Agreement, Karlen began distributing earplugs to a Canadian company called Pharmasystems, again under the "Max" name. Based on the representation of Timothy Drumhiller (Flents' current president) that Karlen no longer sold to Pharmasystems, McKeon agreed to forego any further action. (¶32, Exhibit K)

**Flents merges with Karlen.**

For many years, Flents was headquartered in New York and was a competitor of McKeon's. In 1999, Flents acquired substantially all of Karlen's assets and moved its headquarters to Karlen's headquarters at 5401 S. Grand Road, St. Charles, Michigan. According to the Asset Purchase Agreement which Flents filed with the Securities and Exchange Commission, Flents assumed:

> ...all contracts, promissory notes, lease of personal property and agreements listed on Schedule 1.1(ii) hereto, *and all other contracts, leases, agreements,* promissory notes and other evidences of indebtedness to Karlen in connection with the Business.

(Exhibit L to Verified Complaint, ¶1.1(ii)) emphasis added).

**Flents copies McKeon's trade dress.**

In the past decade, McKeon's packaging has reflected its distinctive trade dress including: a royal blue background with the word "earplugs" in large bright yellow print and white lettering describing the use of the earplugs including, but not limited to, the words "swim," "sleep," "shower," and "sports." (¶36). This distinctive design scheme is frequently featured on a rectangular box with a flat header containing the words "Mack's® Pillowsoft ®" and "earplugs" in bright yellow and with a clear window in the box portion allowing a plain view of the silicone earplugs contained in it. (¶ 37)

When consumers call looking for Mack's® earplugs, McKeon's staff instructs the customers that they are sold in large royal blue boxes with the word "earplugs" across the top in bright yellow. (¶39). McKeon is the only major earplug manufacturer which uses the word "earplugs" in large letters horizontally across the top of its product and the only major earplug manufacturer to use the distinctive blue, yellow and white color scheme. (¶43).

- 4 -

Sometime around June this year, Flents begin distributing private label earplugs to large drugstore chains in packaging modeled directly after McKeon's large "value pack." The Flents packaging is the identical size and shape as McKeon's value pack and is the identical royal blue. (¶43). Moreover, across the middle of the header in large bright yellow letters is the word "earplugs," just as in McKeon's packaging. The overall impression of the Flents silicone earplug packaging is identical to that of McKeon's. (¶¶44-47, Exhibit B).[2] Flents also has begun selling a similar box of foam earplugs consisting of a royal blue horizontal box attached to a header with the words "earplugs" in bright yellow across the middle of that header. As with McKeon's earplugs, the box also states "sleep," "study," "work," and "sports," in white lettering so that the overall impression of the Flents foam earplugs box is identical to McKeon's. (¶¶48-50, Exhibit N).

Flents also sells a similar box of earplugs to Albertson's™ for resale under Albertson's™ private label. The box is identical in size and shape to McKeon's value pack and consists of a royal blue background with bright yellow and white lettering. Across the top of the header, the box contains the word "earplugs" in large letters. Although the word "earplugs" is not in bright yellow, it is in white and yellow. In addition, across the top of the header is a large bright yellow stripe. As a result, the overall impression of the packaging is the same as McKeon's distinctive trade dress. (¶¶51-53, Exhibit O). Finally, Flents appears to have used McKeon's distinctive yellow, blue and white trade dress on every private label package of earplugs it sells even if they are not silicone. (¶54, Exhibit P).

McKeon discovered the infringing trade dress in late June and early July. In July, McKeon's counsel wrote to Flents demanding that they cease and desist using McKeon's distinctive trade dress. (See letter attached as Exhibit 2 to this brief). On August 21, 2002 Flents' counsel responding refusing to alter

---

2   Although photographs of the infringing trade dress are attached to the Verified Complaint, for the Court's convenience, McKeon has also attached photographs of the packaging on display in a drug store to this Brief as Exhibit 1 for the Court's convenience.

the packaging. (See response attached to this brief as Exhibit 3). This lawsuit and motion followed.

## ARGUMENT

To determine whether to grant a preliminary injunction, a court should consider: 1) Whether the plaintiff has a strong likelihood of success on the merits; 2) whether plaintiff will suffer irreparable harm if preliminary relief is not issued; 3) whether the issuance of a prelimary injunction will not cause substantial harm to third-parties; and 4) whether the public interest would be served by the issuance of a preliminary injunction. *Sandison v. Michigan High School Athletic Association, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995). In other words, "the likelihood of success that need be shown (for a preliminary injunction) will vary inversely with the degree of injury the plaintiff will suffer absent an injunction." *Friendship Materials v. Michigan Brick, 679 F. 2d 100, 105 (6th Cir. 1982).*

### A. McKeon has a strong likelihood of success on the merits

McKeon has sued Flents for, *inter alia*, trade dress infringement, trade dress dilution and breach of the Settlement Agreement. As discussed more fully below, the likelihood that McKeon will succeed on any of the claims is extremely high.[3]

### 1. Flents has infringed McKeon's trade dress.

Under well-settled Sixth Circuit law, trade dress:

> . . . embodies that arrangement of identifying characteristics or decorations connected with the product, whether by packaging or otherwise, intended to make the source of the product distinguishable from another and to promote its sale.

*Esercizio SPA v. Roberts*, 944 F.2d 1235, 1238 (6th Cir. 1991). See also, *DAP Products, Inc. v. Color Tile Manufacturing, Inc,*, 821 F.Supp. 488, 492 (S.D. Ohio 1993).[4] The combination of McKeon's royal blue background with the large bright yellow word "earplugs" and the white lettering clearly constitutes such

---

3       McKeon also has sued for violation of the Michigan Consumer Protection Act and under Michigan common law. The test for violation of those laws is the same as under 15 U.S.C. § 1125(a). *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1110, 1105, n.1 (6th Cir. 1991).
4       Infringement of trade dress is actionable under §43(a) of the Lanham Act, 15 U.S.C. §1125 (1). *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 1112 S.Ct. 2753 (1992).

trade dress under the law.  To protect such trade dress, plaintiff must establish three elements: 1) the trade dress must be "inherently distinctive" or have acquired "secondary meaning;" 2) the appropriated features of the trade dress must be non-functional; 3) there must be a likelihood of confusion based on the similarity between the trade dress of the products at issue. *McNeil*, 984 F.Supp. at 1069.  (Citations omitted).

McKeon handily meets all of these requirements.

a)      McKeon's trade dress is inherently distinctive.

Trade dress is inherently distinctive if its "intrinsic nature serves to identify a particular source."

*Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, 529 U.S. 205, 210, 120 S.Ct. 1339, 1343.  The Supreme Court has made clear that product packaging is almost always inherently distinctive:

> The attribution of inherent distinctiveness to certain categories of word marks and product packaging derives from the fact that the very purpose of attaching a particular word to a product or *encasing it in distinctive packaging is most often to identify the source of the product.  Although the words and packaging can serve subsidiary functions... their predominant function remains source identification.* Consumers are therefore predisposed to regard those symbols as indication of the producer, which is why such symbols "almost all *automatically* tell a consumer that they refer to a brand,"... and "immediately... signal a brand or product 'source,'".

*Wal-Mart*, 529 U.S. at 212, 120 S.Ct. 1339 at 1344 (citations omitted).

Here, there is nothing peculiar about earplugs which would require McKeon or anybody else to use this distinct blue, yellow and white combination to package earplugs.  Indeed, until defendant's recent introduction of its packaging, no other earplug company used a royal blue background, let alone a royal blue background with a combination of yellow and white lettering.   On this basis alone, the Court should find McKeon's trade dress inherently distinctive.

Even if the Court could somehow find that McKeon's unique product packaging  is not inherently distinctive it still would be protectable because of its strong secondary meaning.  Trade dress has a secondary meaning, "if it is so recognizable to the general public that it prompts the prospective customers to affirm, 'That is the article that I want because I know its source.'" *Esercizio*, 944 F.2d at 1239.  Here,

McKeon has used it trade dress for nearly a decade in connection with the sale the top-selling earplugs. Clearly, consumers in this market have come to associate the packing with Mack's® earplugs.

Moreover, where, as here, a defendant intentionally copies a plaintiff's trade dress, secondary meaning can be presumed. *Id. See also*, *DAP Products*, 821 F.Supp. at 492. There is no question that Flents copied McKeon's trade dress since at least one of the private label earplugs it sells specifically states "compare with Mack's®" underscoring Flents awareness of the packaging and its intent. *See*, e.g., *McNeil*, 1084 F.Supp. at 1072.[5]

b)   McKeon's trade dress is non-functional.

A product's feature is functional, "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Esercizio*, 944 F.2d at 1246. As discussed above, there is nothing earplugs that requires them to be packaged in royal blue, bright yellow and white packaging. Clearly the color combination is not functional.

c)   Flents' packaging is confusingly similar to McKeon's trade dress.

Almost every factor the Sixth Circuit considers in determining likelihood of confusion favors McKeon: They are: the strength of the plaintiff's mark; the relatedness of the goods; the similarity of the mark; marketing channels used; the likely degree of purchaser ease; the defendant's intent in selecting the trade dress; the likelihood of expansion of the product line; and evidence of actual confusion. *Frisch's Restaurants, Inc. v. Albees Big Boy of Stubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982). These factors, however, are "simply a guide to help determine whether confusion would be likely to result.... They imply no mathematical precision and a plaintiff need not show that all, or even most, of the factors are present in

---

5       Given the inherent strength of product packaging and the intentional copying, further analysis of secondary meaning should not be necessary here; however, the Sixth Circuit looks at seven factors in evaluating secondary meaning:  1) Direct consumer testimony; 2) consumer surveys; 3) exclusivity, length and manner of use; 4) amount and manner of advertising; 5) amount of sales and number of customers; 6) established place in the market; and 7) proof of intentional copying. *Herman Miller, Inc. v. Palazetti Imports and Exports, Inc.*, 270 F.3d 298, 311-312. (Citations omitted.)  These factors are quite similar to the trade dress strength factors discussed at length, *infra*.  In any case, with the exception of the first two factors, all the remaining factors favor McKeon.

any particular case to be successful." *Wynn Oil Co., v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1988) ("*Wynn Oil I*").

<u>The trade dress is virtually identical.</u>

In evaluating trade dress, the test ultimately rests on the "overall impression" of the trade dress, not whether the products can be differentiated when subjected to a side-by-side, element-by-element comparison. *McNeil*, 984 F.Supp. at 1070; *citing, RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir. 1979). Here, Flents' packaging is almost an exact duplicate of McKeon's. Both have a royal blue background with the word "earplugs" in bright yellow across the header and have white lettering throughout the rest of the packaging. In many cases, such as those involving the silicone earplugs, Flents has used an identically sized package with an identical shape for both the box and the header. Moreover, in many cases, Flents has copied McKeon's practice of listing by bullet point the qualities or uses of the earplug; e.g., "swim," "study," "sports." Indeed, as seen from a distance, (*e.g.*, across a drug store aisle) the differences between some of the packages are virtually indiscernible. See, *e.g.*, photographs of a drugstore display, Ex. M to Verified Complaint; Ex. 1 to this Brief. While it is true that there are variations between the two packages, the overall impression is one and the same.

<u>McKeon's trade dress is very strong.</u>

By definition, inherently distinctive trade dress is strong. *McNeil*, 984 F.Supp. at 1070. In further determining strength, the court can also look at a number of factors, including advertising expenditures; consumer studies linking the name to a source; sales success; unsolicited media coverage; attempts to plagiarize the mark; and the length and exclusivity of the marks used. *Blockbuster Entertainment Group v. Laylco, Inc.*, 869 F.Supp. 505, 510 (E.D. Mich. 1994). McKeon's sales success is unassailable. For years Mack's[*] Pillow Soft[*] earplugs have led the market in sales. Moreover, since its new packaging in 1996, McKeon's sales of silicone earplugs have increased over 60 percent; overall sales have risen 110 percent. Moreover, for years Mack's[*] earplugs have received all sorts of unsolicited media coverage (See newspaper

articles, Exhibit D). McKeon advertises in major national publications and, in recent years, has spent hundreds of thousands of dollars in advertising. Finally, it is also clear that Flents has attempted to plagiarize the trade dress. Thus, every factor other than a consumer study favors McKeon, underscoring the great strength of this highly distinctive trade dress.

The goods are directly related and marketed in virtually identical fashion.

The goods at issue here are earplugs and thus identical products. In addition, the products are sold directly through identical retail channels, specifically drugstores.

The degree of purchaser care and sophistication is low.

The less care that a purchaser is likely to take in comparing products, the greater the likelihood of confusion. *Wynn Oil Co., v. American Way Service Co.*, 943 F.2d 595, 602 (6th Cir. 1991). ("*Wynn II*") Consumers are much less likely to exercise a great deal of care in determining the origin of a product if the product is inexpensive. *Hindu Incense v. Medows*, 692 F.2d 1048, 1051 (6th Cir. 1982); *Blockbuster*, 869 F.Supp. 505, 514. Earplugs are an inexpensive commodity item that sell for under $4.00. Consumers are not likely to exercise a high degree of care in their purchases, thereby making the likelihood of confusion even greater. *Blockbuster, Id.*

Flents intentionally selected McKeon's trade dress.

Where a junior user copies a trade dress, bad faith may be presumed if the defendant had actual or constructive knowledge of the plaintiff's trade dress. *McNeil*, 984 F.Supp. at 1072. Here, as in the *McNeil* case, there is no question that Flents was aware of McKeon's trade dress when it put "Compare with Mack's[®]" on at least one of its packages and offered a miniscule disclaimer on the back of such packages that "Mack's" is the registered trademark of McKeon Products, Inc. (¶55, Exhibit Q). In *McNeil*, this court specifically recognized that virtually identical facts underscored defendant's bad faith:

> …[T]he fact that defendant put the disclaimer in small print on the back of the package is itself probative of not only defendant's knowledge of possible confusion, but also that defendant intended to confuse the consumer, at least at the point of consumer's initial contact with the product.

*Id.* at 1072. The Sixth Circuit has specifically held that the intentional copying of another party's trade dress alone "may be sufficient to justify the inference that there is confusing similarity." *Esercizio*, 944 F.2d at 1242. (Citations omitted).

<u>Flents is likely to expand into other product lines.</u>

Here, Flents has not only used the trade dress for its silicone earplugs, but has used it for all of its earplug products. It also appears that Flents has used the trade dress for more than one private label (e.g., Walgreens® and Albertson's ™) and undoubtedly will continue to attempt to expand for as many private labels for as many earplugs as possible.

<u>The lack of actual confusion is not fatal.</u>

Courts repeatedly recognize that since evidence of actual confusion is very difficult to prove such evidence is not necessary to prevail under the Lanham Act. *Blockbuster*, 869 F.Supp. at 513, *Wynn Oil I*, 839 F.2d at 1188. Where, as here, the junior user's product has been in the market a short period of time, the possibility of gathering actual confusion evidences even more difficult and not particularly probative. *Daddy's Junky Music Stories, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 284 (6th Cir. 1997), citing *Wynn Oil I, id.* (actual confusion only significant "where there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available.")

In short, McKeon's strong showing on seven of the eight Sixth Circuit factors mandates a finding of likelihood of confusion.

This case underscores the danger of confusion to consumers and to McKeon. A consumer going down a drugstore aisle could easily pick up the wrong earplugs. Flents' silicone earplugs have a lower sound attenuation rating (the government-mandated standard for earplug noise prevention) (see back of silicone packages, Exhibit Q) and also are smaller and, thus, more likely to get stuck in a consumer's ear. The fact that a consumer is more likely to have a bad experience with Flents earplugs and believe they come from the same source or sponsor as McKeon could be devastating to McKeon.

Even if a consumer ultimately figures out that McKeon makes one set of earplugs and Flents makes the other, the fact that Flents has succeeding in grabbing the consumer's attention is sufficient to support a finding of likelihood of confusion. "Such 'bait and switch' confusion, also known as 'initial interest' confusion, will affect the buying decisions of the consumers when it permits the competitor to 'get its foot in the door' by confusing the customers. *Syndicate Sales, Inc. v. Hampshire Paper Corp.* 193 F.3d 633, 638 (7th Cir. 1999)

The danger of initial interest confusion was central in *Blockbuster*, 869 F.Supp. 505. There, Blockbuster Video sued a junior user who opened a chain of video rental stores using the name "Video Busters." "...[S]ome unwitting customers might enter a Video Busters Store thinking it is somehow connected to Blockbuster. Those customers will probably realize shortly that Video Busters is not related to Blockbuster, but [under existing law] that is irrelevant." *Id.* at 513.

As the *McNeil* court found, private-label knockoffs like the ones here are premised on the hope that the consumer will initially confuse the products. There, *McNeil* produced a product called Lactate Ultra and Arbor Drugs sold Arbor Ultra Lactate. The packaging between the two, as here, was virtually identical. There, like here, the products were displayed side by side on drugstore shelves, thereby allowing the junior user to grab the customer's interest based on the senior user's reputation:

> It was defendant's intent in appropriating plaintiff's trade dress...to confuse or "hook" customers at the initial point of contact with the product, thus initially drawing the customers to its product through its similarity in trade dress. *That the customer might realize that defendant's product is not plaintiff's before he gets to the check out counter to pay for it is irrelevant.* Even if the consumer realizes that the Arbor product is not the same as the national brand *once he picks the product up off the shelf and reads the label, defendant has already accomplished what it set out to do, which is to confuse the consumer at the point when he first reaches for the product on the shelf.*

*Id.* at 1074. (emphasis added) Obviously the same danger exists here. A consumer might ultimately figure out that the private label earplugs he or she is picking up are not McKeon's. Nevertheless, Flents will have succeeded in trading on McKeon's good will to get them to initially pick them up off the shelf.

In *McNeil*, the defendant tried to argue that signs or language comparing its product to the national brand would dispel any confusion. The court flatly rejected this contention, finding that whole purpose of copying the senior user's trade dress was to trade on its goodwill and that if the defendant truly only wanted to compare, "it would have made its package as distinct as possible from that of plaintiff's product." 984 F.Supp. at 1073. (emphasis added)

In any case, Flents can't raise that argument here because it has used McKeon's trade dress on apparently all of its private label earplugs, including its childrens' and foam earplugs. (See photos, Exhibit P) For example, its foam earplugs use a virtually identically shaped box with a royal blue background, bright yellow "earplugs" across the top of the header and white lettering. The package then says "Compare to Flents." A consumer already familiar with McKeon's silicone earplugs easily could be drawn to the foam earplug products based on McKeon's distinctive trade dress. It would be reasonable for a consumer to conclude that Flents would not want to cannibalize its own foam earplug product and that it is McKeon who is making the private label earplugs. Only if the consumer engaged in a detailed analysis of the back of the box would it realize that the private label earplugs are in fact also Flents products.[6] The problem is even worse on the children's earplugs which identify no manufacturer at all, (Exhibit Q) thus requiring Herculean efforts to ascertain the true manufacturer. No appropriate reading of the Lanham Act requires that depth of analysis, especially for a commodity item like earplugs.

**B.      Flents' Packaging Dilutes McKeon's Trade Dress**

In 1996, Congress amended the Lanham Act to add an additional unfair competition tort: dilution. 15 U.S.C. §1125(c)(1). Unlike trademark infringement, with dilution a consumer is aware that the products come from different sources; the use by the junior user, however, causes the effectiveness of the senior mark

---

6      Even a detailed comparison of boxes with manufacturers could produce additional confusion. Both McKeon and Flents put their address on the back of their boxes, which identifies them as Michigan companies. Although one is in St. Charles and the other is in Warren, it certainly would not be unreasonable or unthinkable for a consumer unfamiliar with southeastern Michigan geography to conclude the two companies are somehow related or even one and the same.

to slowly erode:

> Dilution occurs when the senior user posses a distinctive mark, the junior use of
> which might not, in the short run, result in loss of sales or loss of control over
> reputation but might cause a gradual diminution in the mark's distinctiveness,
> effectiveness and, hence, value. This kind of infringement corrodes the senior
> user's interest in the trademark by blurring its product identification or by
> damaging positive associations that have attached to it.

*Ameritech, Inc. v. American Information Technologies Corp.*, 811 F.2d 960 (6th Cir. 1987).[7]

The current case underscores the danger against which dilution laws seek to guard. For a decade McKeon has been the only company to employ its royal blue, bright yellow and white trade dress causing its products to stand out on store shelves and be instantly identified as McKeon's products. By slapping identical trade dress onto every private label product it sells, Flents has caused McKeon's trade dress to become awash in a sea of similar packaging thereby eroding the distinctive nature of McKeon's trade dress and, thus, its effectiveness.

The Federal Trademark Dilution Act ("FTDA"), 15 U.S.C. §1125(c)(1) provides:

> The owner of a famous mark shall be entitled, subject to the principles of equity
> and upon such terms as the court deems reasonable, to an injunction against
> another person's commercial use in commerce of a mark or trade name, if such use
> begins after the famous mark has become famous and causes dilution of the
> distinctive quality of the famous mark, and to obtain such relief as is provided in
> the subsection.

The Sixth Circuit has adopted the Second Circuit's standards for finding dilution under this section.[8] *See, V Secret Catalogue, Inc. v. Moseley*, 259 F.3d 464, 468-469 (6th Cir. 2001) *citing Nabisco, Inc. v. PF Brands Co.*, 191 F.3d 208, 215 (2nd Cir. 1999). The senior mark must be 1) famous; and 2) distinctive; and the junior mark: 1) must be in commercial use; 2) must be used after the senior mark has become famous; and 3) must cause dilution of the distinctive quality of the

---

7    Although the *Ameritech* case was decided under Ohio's common law dilution and pre-dates the federal act, the dilution concept is the same.

8    Courts have held that, as with other Lanham Act claims, the FTDA applies to trade dress as well. See, e.g., *Clinique Laboratories, Inc. v. DEP Corp.*, 945 F.Supp. 547, 561, n.z. (S.D.N.Y. 1996). See also, *Herman Miller*, 270 F.3d at 317 (Sixth Circuit revives trade dress dilution claims.)

mark. *Id.*

1.   McKeon's mark is "famous."

As a preliminary matter, it is important to note that a mark need not be universally known

to be famous, but rather can be famous within its "niche" market provided, as here, the two marks

are competing in the same or similar markets. *Times Mirror Magazines, Inc. v. Las Vegas Sporting*

*News, L.L.C.*, 212 F.3d 157, 164-65 (Third Cir. 2000); *Syndicate Sales, Inc. v. Hampshire Paper*

*Corp.*, 192 F.3d 633, 640-41 (7th Cir. 1999). See also, *Ameritech,* 811 F.2d at 967, applying Ohio

law. (mark might be weak in national market, "but still might be strong in the senior user's

geographical and product area and thus deserving of protection.")[9]

To determine a mark's "fame" under the FTDA, a court should consider the following

factors, including, but not limited to the degree of inherent or acquired distinctiveness of the mark;

the duration and extent of use of the mark; the duration and extent of advertising and publicity of the

mark; the geographic extent of the trading area in which the mark is used; the channels of trade for

the goods or services for which the mark is used; the degree of recognition of the mark in the

trading areas and channels of trade of the mark's owner and the person against whom the injunction

is sought; the nature and extent of use of the same or similar marks by third parties; and whether the

mark was previously registered

15 U.S.C. §. 1125 (c).

With the exception of the eighth factor–registration–McKeon meets all of the badges of

fame. As discussed above, McKeon's trade dress is quite strong, not only because of the inherent

distinctiveness of trade dress in packaging, but because of the strong secondary meaning attached to

the trade dress. The trade dress has been used for 10 years on the display box and six for packaging.

---

9        As both the Seventh and Third Circuit found, those cases rejecting the niche market theory involved parties
operating in different markets. *Times Mirror,* 212 F.3d at 164; *Syndicate Sales,* 192 F.3d at 640.

McKeon has consistently advertised Mack's® earplugs (and used the packaging in the ads) and the earplugs have often been the subject of media attention. The earplugs are sold in every state and are in the identical channels of trade as Flents'. Since Flents has only used the trade dress for a few months, the degree of recognition of McKeon's trade is obviously much higher. Likewise, until Flents began using McKeon's trade dress, no other earplug manufacturer used in. In short, Flents would be hard-pressed to argue that among earplug purchasers, the top-selling earplug packaging is not "famous."

2.      The remaining factors of dilution all favor McKeon.

McKeon easily meets the remaining Sixth Circuit requirements for dilution. As discussed above, the trade dress is distinctive, Flents' use of the trade dress obviously is commercial and McKeon's trade dress acquired its fame long before Flents introduced its copycat packaging.

The fifth element, "dilution of the distinctive quality of the mark" is "the key operative element of the statute." *Nabisco*, 191 F.3d at 216. "The antidilution statutes rest on a judgment that the 'stimulant effect' of a distinctive and well-known mark is a 'powerful selling tool' that deserves legal protection." *Nabisco, id.* at 217, citing Restatement (Third) of Unfair Competition, § 25 cmt.c (1995). By repeatedly using this "powerful selling tool," the junior user can reduce the public's perception that the particular trade dress belongs to the senior user. *Id.* Such use constitutes "blurring," where the public begins associating both the junior and senior user with the trade dress. *Times Mirror*, 212 F.3d at 168.

Should Flents be allowed to use this trade dress with its private label earplugs (including those which, it seems, it is not seeking to compare with McKeon's), the public no longer will associate the trade dress with McKeon, but with any number of private label earplugs sold at any number of drug stores or mass merchandisers.

The Sixth Circuit has also relied on the Second Circuit's ten-factor non-exclusive list to measure the likelihood of such dilution.[10]

McKeon has discussed most of these factors (all of which favor McKeon with the exception of actual confusion) at length above and will not repeat the discussion here.[11]  The last two factors, harm to the junior user and delay (and its effect) by the senior user weigh strongly against Flents.  Upon discovering Flents' copying, McKeon immediately wrote to Flents demanding it cease and desist use and then promptly filed this motion when it failed to comply.  Likewise, harm to Flents should be *de minimus*, given its few months of use.

"Adjectival or referential quality of the junior use," means whether upon seeing a particular mark or trade dress on the junior user's product, the consumer would be predisposed to think of the product.  For example, in *Nabisco*, in examining the dilution of the popular Goldfish crackers, the court pointed out that a fish image used in conjunction with a fish business "would lead consumers to understand the fish sign as descriptive of the junior's business, regardless whether it is also being used as a mark." 191 F.3d at 221.  Here, as discussed above, but for the fact that McKeon has used its distinctive blue, yellow and white trade dress in connection with the sale of earplugs, nothing about that combination should otherwise lead consumers to think of earplugs.  Thus, the "adjectival or referential quality" of Flents' use is considerably low.[12]

---

10      The Sixth Circuit (as well as the Second and Seventh) has adopted a "likelihood of dilution" test rather than requiring as showing actual harm.  The Supreme Court had granted certiorari in the *Victoria's Secret* case to resolve a circuit split on this issue, 122 S.Ct. 1535; however, as of the filing of this brief, only the petitioner had filed its papers.  Thus, it will be months before the Supreme Court resolves this issue and no showing of actual harm remains the law in this circuit.

11      They are: distinctiveness; similarity of marks; proximity of the products and likelihood of bridging the gap; interrelationship among the distinctiveness of the senior mark, the similarity of the junior mark, and the proximity of products; shared consumers and geographic limitations; sophistication of consumers; actual confusion; adjectival or referential quality of the junior use; harm to the junior user and delay by the senior user; and the effect of [the] senior user's prior laxity in protecting the mark.  *Victoria's Secret*, 259 F.3d at 476.

12      While finding the district court improperly found predatory intent, the *Nabisco* court also analyzed this factor, quoting the district court that such intent by the junior user supports dilution "hoping to benefit commercially from association with the [famous] senior mark." 191 F.3d at 225. (citations omitted)  This, in essence, describes the whole intent of private-label knockoffs.  Obviously, Flents would not have used McKeon's trade dress and stated "Compare to Mack's®" if did not want consumers to think of Mack's® earplugs and then pick up its earplugs.

3.      **Flents Violated the Settlement Agreement.**

There is no question that Flents is bound by Karlen's 1996 Settlement Agreement. Under

well-settled Michigan law a purchaser of assets is liable for the successor's obligations when the

purchaser "expressly or impliedly" assumes the liabilities of the company it is acquiring. *City*

*Mgmnt. Corp. v. U.S. Chemical Corp.*, 43 F.3d 244, 251 (6th Cir. 1994). As discussed above,

Flents assumed all of Karlen's contracts and thus should be bound by this contract as well.

The purpose and intent of the Settlement Agreement was clear. In agreeing to settle with

Karlen, McKeon wanted to ensure that it no longer would be forced to battle over the copying of

McKeon's products and intellectual property. Thus, the agreement specifically provided:

> ...that [Karlen] will immediately cease using the word or mark "Max," "Mack's,"
> *or any other confusingly similar mark or other form of unfair competition* in
> connection with the sale or distribution of Karlen's products.

(emphasis added) The parties agreed that Karlen no longer would copy or attempt to copy

McKeon's trademarks and trade dress. Today, Flents has done precisely that and, in so doing,

violated this Court's order. This basis alone should be sufficient for entry of a preliminary

injunction.

B.      **McKeon Meets the Remaining Factors for Preliminary Injunction**

In issuing a preliminary injunction, the Court also must consider whether McKeon will be

irreparably harmed, whether there will be harm to third parties and the public interest. As a general

rule, finding of irreparable injury ordinarily follows when a likelihood of confusion or possible risk

to reputation appears. *Wynn Oil II* 943 F.2d at 608. Any harm to third parties would be non-

existent. Flents has only used the packaging for a few months. Clearly neither Flents nor any other

party has come to rely on this packaging for any economic benefit. Finally, the public interest will

be served by issuing an injunction. Trademark laws are designed to prevent consumer confusion

and to protect the right of the trademark owner to control its product's reputation. *Blockbuster*, 869

F.Supp. at 516. Thus, it is certainly in the public interest to prevent consumer confusion between

McKeon's trade dress and Flents infringing the trade dress and to protect the reputation of McKeon.

## CONCLUSION

For the reasons set forth above, this Court should enter a preliminary injunction against

Flents.

Kevin Tottis
Law Offices of Kevin Tottis
One East Wacker Drive, Suite 2420
Chicago, Illinois 60601
Attorney for Plaintiff
(312) 923-9620

Ann Marie Uetz (P48922)
Foley & Lardner
150 W. Jefferson, Suite 1000
Detroit, Michigan 48226
Attorneys for Plaintiff
(313) 963-6200

Dated:  August 22, 2002

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

McKEON PRODUCTS, INC.,
a Michigan corporation,

                Plaintiff,

v.

FLENTS PRODUCTS CO., INC., f/k/a
KARLEN MANUFACTURING CO.,
INC., a Delaware corporation,

                Defendant.

_____ /

**02-73400**

Case No.

Hon.  BERNARD A. FRIEDMAN

**MAGISTRATE JUDGE CARLSON**

FILED
AUG 22 'P 3: 36
U.S. DIST. COURT CLERK
EAST. DIST. MICHIGAN
DETROIT

Ann Marie Uetz (P48922)
Foley & Lardner
150 W. Jefferson, Suite 1000
Detroit, Michigan 48226
Attorney for Plaintiff
(313) 963-6200

Kevin Tottis
Law Offices of Kevin Tottis
One East Wacker Drive, Suite 2420
Chicago, Illinois 60601
Attorney for Plaintiff
(312) 923-9620

_____ /

## NOTICE OF HEARING

020.30483.1

PLEASE TAKE NOTICE that Plaintiff's Motion for Preliminary Injunction will be

brought on for hearing on a date and time to be set by the Court.

Respectfully submitted,

Kevin Tottis
Law Offices of Kevin Tottis
One East Wacker Drive, Suite 2420
Chicago, Illinois 60601
Attorney for Plaintiff
(312) 923-9620

Ann Marie Uetz (P48922)
150 West Jefferson Avenue
Suite 1000
Detroit, Michigan 48226
(313) 963-6200
Attorneys for Plaintiff

Dated: August 22, 2002

020.30483.1

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

# SEE CASE FILE FOR ADDITIONAL DOCUMENTS OR PAGES THAT WERE NOT SCANNED